

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00082-CR

_____

FREDERICK L. BROWN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 47,806-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion on Remand by Justice Stevens

## MEMORANDUM OPINION ON REMAND

In a single trial, Frederick L. Brown was convicted of (1) the second-degree felony offense of family violence assault by impeding the normal breathing or blood circulation of Lori Hutzelman[1] and (2) the third-degree felony offense of family violence assault[2] against Hutzelman. Brown was sentenced to concurrent prison terms of five years and ten years, respectively. On appeal, Brown claims that Hutzelman's statements to officers who responded to a 9-1-1 call reporting domestic violence were testimonial hearsay and were therefore improperly admitted over his hearsay and Confrontation Clause objections. Conversely, the State contends that, because Hutzelman's statements were nontestimonial excited utterances, the trial court properly admitted them. Although we find that (1) Hutzelman's statements to the first officer who questioned her were excited utterances, (2) we find that those statements were nevertheless testimonial, (3) her statements to the second officer were likewise testimonial, and (4) because Brown was harmed by the admission of those statements in violation of his Confrontation Clause rights, he is entitled to a new trial.

### I.    Factual and Procedural Background

On June 25, 2018, a resident of 1707 Hutchings Street in Longview called 9-1-1 to report a black male and a white female fighting outside 1704 Hutchings Street. Patrol officers responded to the call at 1704 Hutchings and interviewed Hutzelman and Brown. Brown was arrested at the scene and was later tried on two counts of family violence assault.

---

[1] *See* TEX. PENAL CODE ANN. § 22.01(b-3) (Supp.).

[2] *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(A) (Supp.).

2

Before the trial began, the trial court asked if there was anything that it needed to take up outside the presence of the jury. The State informed the trial court that, if there were issues with the admission of Hutzelman's statements to investigating officers, those issues needed to be resolved. In response to the trial court's inquiry, Brown objected to the statements "on the grounds of confrontation and hearsay."[3] The State responded by indicating that Hutzelman's

[3]The exchange was as follows:

THE COURT: . . . . Do we need to take up anything outside the presence of the jury?

[The State]: Well, that's kind of a loaded question.

THE COURT: I know, that's why I'm asking now.

[The State]: If there's some issues with the victim's statements getting in --

THE COURT: Yes.

[The State]: -- then yes.

THE COURT: Okay. So are those video statements or --

[The State]: They are. Technically, I don't think that you can really hear them on the video. She's very soft-spoken.

THE COURT: Okay.

[The State]: The officers would be testifying.

THE COURT: As to what she said?

[The State]: Yes, yes.

THE COURT: Okay.

. . . .

THE COURT: And are you going to object, Mr. Owens?

[Defense counsel]: Yes, to -- on the grounds of confrontation and hearsay.

THE COURT: . . . . I'm supposed to decide whether it's testimonial or non-testimonial and allow those statements or not.

3

statements to the officers called to the scene were admissible under the theory of forfeiture by wrongdoing and because the statements were nontestimonial. The trial court then conducted a hearing pursuant to Article 38.49 of the Texas Code of Criminal Procedure to determine if the doctrine of forfeiture by wrongdoing applied.[4] *See* TEX. CODE CRIM. PROC. ANN. art. 38.49. At the conclusion of the hearing, the trial court ruled that the doctrine applied, thereby effecting a waiver of Brown's Confrontation Clause objection.[5]

At trial, John Delgado, a patrol officer employed by the Longview Police Department, testified that he responded to a family violence call on June 25, 2018, at 1704 Hutchings Street. When Delgado arrived, Brown was sweeping glass from the living room floor, and Hutzelman was sitting on the couch in the living room. Brown told Delgado that he and his girlfriend "were

---

[The State]:     No, it's non-testimonial.

THE COURT:     I know but I think I have to make that decision.

[4]The evidence at this hearing related solely to the issue of forfeiture by wrongdoing. This doctrine bars a defendant "from asserting his right of confrontation when he has wrongfully procured the unavailability of the witness." *Shepherd v. State*, 489 S.W.3d 559, 573 (Tex. App.—Texarkana 2016, pet. ref'd). To preserve a complaint for appellate review, Brown must have presented to the trial court "a timely request, objection, or motion that . . . stated the grounds for the desired ruling." TEX. R. APP. P. 33.1(a)(1)(A). The trial court must have "ruled on the request, objection, or motion, either expressly or implicitly," or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2). When an objection is brought to the trial court's attention and the trial court's subsequent action clearly addresses the complaint, appellate courts will generally find that a trial court made an implicit ruling on the objection. *State v. Kelley*, 20 S.W.3d 147, 153 n.3 (Tex. App.—Texarkana 2000, no pet.). There is no question that Brown asserted his Confrontation Clause objection to Hutzelman's statements to officers (encompassed on recording and by their testimony). Although the trial court did not explicitly rule on that objection, the trial court ruled that the doctrine of forfeiture by wrongdoing applied. Because of that ruling, Brown was effectively barred from asserting his right of confrontation. We conclude that the trial court implicitly overruled Brown's Confrontation Clause objection.

[5]This case was originally appealed to this Court in 2019. In that appeal, this Court found that the trial court acted within its discretion in finding forfeiture by wrongdoing and in admitting Hutzelman's June 25, 2018, out-of-court statements to officers. The Texas Court of Criminal Appeals reversed our judgment—finding that the State did not meet its burden to show that Brown engaged in conduct that caused Hutzelman's absence from court—and remanded the case so that we could address the State's remaining grounds for upholding the admission of Hutzelman's out-of-court statements raised in the Texas Court of Criminal Appeals.

4

just getting into it." Delgado described Hutzelman's demeanor as scared and very quiet. It seemed like she did not want to talk to the officers. Instead, Brown was doing all the talking. Delgado took Hutzelman out of the living room, through the kitchen, and into a hallway to the right of the kitchen to talk with her. Officer Jonathan Wolf, also with the Longview Police Department, stayed with Brown.

Delgado testified that, when he spoke with Hutzelman, she told him that she and Brown were "getting into it" and that he began to assault her as they were arguing. Hutzelman told Delgado that Brown had thrown an object at her in the kitchen, then punched her in the stomach. He then hit her with a broom in the shoulder and upper torso area ten times. After Brown dropped the broom, he grabbed Hutzelman around the throat and began to choke her. Hutzelman kicked Brown and was able to break free and go outside, where she and Brown continued to argue. Brown then pulled Hutzelman back inside the house.

As she was speaking with Delgado, Hutzelman still seemed to be scared. According to Delgado, Hutzelman was afraid of what was going on, and she was afraid of Brown. Delgado observed a broken blood vessel in her right eye and red markings on her throat area, as if someone had grabbed her throat.[6]

Wolf also responded to the domestic violence call at 1704 Hutchings Street on June 25. He arrived at about the same time as Delgado, and they approached the front door together. Wolf's testimony largely mirrors that of Delgado. He provided additional details of the incident, though, based on his own questioning of Brown and Hutzelman. While Delgado was speaking

---

[6]Delgado stated that he was not wearing a body camera at the time of those events because it was broken.

with Hutzelman in the hallway, Brown told Wolf that Hutzelman was having a seizure and items got broken in the process. He further stated that Hutzelman was having issues with her medications, that he took care of her, and that he did everything he could to keep her calm.

When Delgado finished speaking with Hutzelman, Wolf conducted his own interview with her. That interview also took place in the hallway off the kitchen and was recorded on Wolf's body camera. When he spoke with Hutzelman, Wolf felt like she was "a little bit more emotional" and that he could tell that she was crying. Although she seemed upset, Hutzelman did not appear to be erratic or "out of control."

In her statement to Wolf, Hutzelman explained that she had been sick on the couch and Brown accused her of not doing anything during the day. Hutzelman told Wolf that the argument with Brown escalated to a physical assault when Brown placed his hands in her face and poked her in the eye while she was sitting on the couch. Wolf stated that Hutzelman's right eye was bruised and bloodshot. Hutzelman also told Wolf that Brown hit her multiple times with a broom and choked her at one point. She stated that she tried to get her phone and call the police, but Brown took her phone during the altercation.

Hutzelman further explained to Wolf that she kicked Brown to get him off her and that Brown hit her in the head after she stepped outside and then pulled her back inside the house by the back of her hair.[7] She explained that the bruising on her arm was caused by being struck with a broom. She also stated that the injury to the upper part of her left arm was a result of the altercation with Brown. Wolf testified that, as he was taking photographs of Hutzelman's

---

[7]The State offered and introduced eight photographs taken by Wolf at the time he interviewed Hutzelman depicting Hutzelman's injuries and a recording from Wolf's body camera of his investigation of the domestic violence report.

6

injuries, he noticed some redness on the left side of her neck.[8]  Hutzelman declined to give a recorded statement or a written statement and told Wolf that she did not want to prosecute Brown.

## II.     Applicable Law and Standard of Review

Under the Sixth Amendment, "the accused shall enjoy the right to . . . be confronted with the witnesses against him" "[i]n all criminal prosecutions."  U.S. CONST. amend. VI.  "The Sixth Amendment's right of confrontation is a fundamental right and is applicable to the States by virtue of the Fourteenth Amendment."  *Moore v. State*, 169 S.W.3d 467, 470 (Tex. App.— Texarkana 2005, pet. ref'd) (quoting *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991)).  As a result, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:  unavailability [of the witness] and a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  This is true even if the statement falls under a firmly rooted hearsay exception.  *Id.*

"Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling, *i.e.* whether a statement is testimonial or non-testimonial, *de novo*."  *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).  "By contrast, [we] review a trial court's determination of whether evidence is admissible under the excited utterance exception to the hearsay rule only for an abuse of discretion," *id.* at 743, and "will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case," *James v. State*,

---

[8]Approximately three months after the incident, Hutzelman filed an affidavit of non-prosecution, in which she stated that Brown did not hit her and was just holding her back from breaking the table.

555 S.W.3d 254, 258 (Tex. App.—Texarkana 2018, pet. dism'd, untimely filed) (citing

*De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).  As the *Wall* court explained,

> [T]he distinctive standards of review for hearsay objections and Confrontation Clause objections to the admission of excited utterances arise because the hearsay exception depends largely upon the subjective state of mind of the declarant at the time of the statement, whereas the issue of whether an out-of-court statement (excited or otherwise) is "testimonial" under *Crawford* depends upon the perceptions of an objectively reasonable declarant.

*Wall*, 184 S.W.3d at 743 (footnote omitted) (citations omitted).  Because "the excited utterance

and testimonial hearsay inquiries are separate, but related," we must first determine "whether a

particular hearsay statement qualifies as an excited utterance."  *Id.* at 742 (quoting *U.S. v. Brito*,

427 F.3d 53, 61–62 (1st Cir. 2005)).  In doing so, we focus our inquiry "on whether the declarant

was under the stress of a startling event."  *Id.*  If a statement qualifies as an excited utterance, we

then must determine, based on the attendant circumstances, whether the statement was

testimonial.  *Id.*

## III.    Analysis

### A.    Hutzelman's Statements to Delgado Qualified as Excited Utterances

Brown claims that, because Hutzelman was no longer under the stress or excitement from

the alleged event, her statements to Delgado and Wolf do not qualify as excited utterances.  The

State claims that the statements were not barred by the hearsay rule because they were excited

utterances, and alternatively, it contends that Brown failed to preserve his hearsay objection to

the officers' collective testimony.[9]

---

[9]Brown objected to the admission of Hutzelman's statements to investigating officers based on confrontation and hearsay at the Article 38.39 hearing and did not object to this testimony during trial on the basis of hearsay.  In

8

Yet, we are to uphold an evidentiary ruling "if it was correct on any theory of law applicable to the case." *James*, 555 S.W.3d at 258. "A trial court does not abuse its discretion if some evidence supports its decision." *Tarley v. State*, 420 S.W.3d 204, 206 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002)). "Even when the trial judge gives the wrong reason for his decision, *Salas v. State*, 629 S.W.2d 796, 799 ([Tex. App.—Houston [14th Dist.] 1981, no pet.]), if the decision is correct on any theory of law applicable to the case it will be sustained." *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Moreno v. State*, 341 S.W.2d 455, 456 (Tex. Crim. App. 1961); *Calloway v. State*, 743 S.W.2d 645, 651–52 (Tex. Crim. App. 1988)). "This is especially true with regard to the admission of evidence." *Id.* (citing *Dugard v. State*, 688 S.W.2d 524 (Tex. Crim. App. 1985), *overruled on other grounds by Williams v. State*, 780 S.W.2d 802 (Tex. Crim. App. 1989) (per curiam); *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. [Panel Op.] 1982)). Because the issue of whether Hutzelman's statements to the officers qualify as excited utterances is intertwined with the issue of whether those same statements are testimonial, we address this issue. *See Wall*, 184 S.W.3d at 742. We initially determine whether the trial court could have concluded that Hutzelman's statements to Delgado qualified as excited utterances under Rule 803(2) of the Texas Rules of Evidence. *See* TEX. R. EVID. 803(2).[10]

---

addition, the State claims that the trial court did not rule on Brown's hearsay objection. On appeal, Brown contends that the statements do not qualify as excited utterances.

[10]Under this Rule, "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," TEX. R. EVID. 803(2), is "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," TEX. R. EVID. 803.

9

Our previous summary of the law governing the applicability of the excited-utterance exception states:

> For the excited-utterance exception to apply, three conditions must be met: (1) the statement must be a product of a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous and unreflecting, (2) the state of excitement must still so dominate the declarant's mind that there is no time or opportunity to contrive or misrepresent, and (3) the statement must relate to the circumstances of the occurrence preceding it.

*Juarez v. State*, 461 S.W.3d 283, 295 (Tex. App.—Texarkana 2015, no pet.) (quoting *Goodman v. State*, 302 S.W.3d 462, 471–72 (Tex. App.—Texarkana 2009, pet. ref'd) (citing *Sellers v. State*, 588 S.W.2d 915, 918 (Tex. Crim. App. [Panel Op.] 1979); *Mumphrey v. State*, 155 S.W.3d 651, 663 (Tex. App.—Texarkana 2005, pet. ref'd))). "The critical factor in determining when a statement is an excited utterance under Rule 803(2) 'is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event.'" *Id.* (quoting *Goodman*, 302 S.W.3d at 472 (quoting *Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995), *overruled on other grounds by Mosely v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998))). "The time elapsed between the occurrence of the event and the utterance is only one factor considered in determining the admissibility of the hearsay statement." *Id.* (quoting *Goodman*, 302 S.W.3d at 472 (citing *Lawton*, 913 S.W.2d at 553)). "That the declaration was a response to questions is likewise only one factor to be considered and does not alone render the statement inadmissible." *Id.* (quoting *Goodman*, 302 S.W.3d at 472) (citing *Lawton*, 913 S.W.2d at 553).

The evidence showed that Delgado responded to a 9-1-1 call in response to a neighbor's report of domestic violence. While it is unclear how much time elapsed from the time of the call until the officers arrived on the scene, it is apparent that Hutzelman was frightened and upset by

10

the entire incident by the time of her encounter with Delgado. When Delgado arrived, there was broken glass on the floor, and the injured Hutzelman was seated on the couch. Brown was still in the room with her.

Delgado spoke with Hutzelman within a minute of having arrived on the scene. Her right eye was bruised and red, her left arm was bruised after having been struck by a broom, and there was a hand mark on the left side of her neck. Delgado's testimony seemed to indicate that the exchange between Hutzelman and him consisted of Hutzelman responding to his questions. According to Delgado, Hutzelman was afraid of what was going on, she was afraid of Brown, and she was still scared when he was asking her questions about what had just transpired. Hutzelman told Delgado that Brown choked her for four or five seconds and that she was still frightened when she was speaking with him. Given this evidence, the trial court could have concluded that Hutzelman's statements to Delgado were made while she was "still dominated by the emotions, excitement, fear, or pain of the event," *Juarez*, 461 S.W.3d at 295, and were "related to the startling occurrence of the assault," *Reyes v. State*, 48 S.W.3d 917, 920 (Tex. App.—Fort Worth 2001, no pet.) (domestic abuse victim's statement to officer who arrived at scene six to seven minutes after 9-1-1 call was excited utterance).

**B.      Hutzelman's Statements to Delgado Were Nevertheless Testimonial**

"The mere fact that a statement may be an excited utterance does not satisfy the Confrontation Clause concerns espoused in *Crawford*." *Moore v. State*, 169 S.W.3d 467, 474 (Tex. App.—Texarkana 2005, pet. ref'd). "Rather, the event that gives rise to an excited utterance informs the Confrontation Clause analysis and sheds light on the inquiry as to the

11

testimonial nature of the Statement." *McCarty v. State*, 227 S.W.3d 415, 418 (Tex. App.—Texarkana 2007, *aff'd*, 257 S.W.3d 238 (Tex. Crim. App. 2008) (citing *Wall*, 184 S.W.3d at 740)).

Although *Crawford* did not define the term "testimonial," it stated that, at a minimum, the term includes certain categories of statements, including, among others, those "taken by police officers in the course of interrogations" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. "In determining whether a statement is 'testimonial,' we use the standard of an objectively reasonable declarant standing in the shoes of the actual declarant." *Miles v. State*, 259 S.W.3d 240, 252 (Tex. App.—Texarkana 2008, pet. struck) (citing *Wall*, 184 S.W.3d at 742–43). "The timing, purpose, and setting of a challenged statement can be relevant considerations when determining whether the statement's primary purpose is testimonial." *Id.* (citing *Davis v. Washington*, 547 U.S. 813 (2006)).

In *Davis v. Washington*, the United States Supreme Court examined the issue of "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 817 (2006).

The *Davis* court decided companion cases, the first involving a 9-1-1 call. In that case, witness, Michelle McCottry, had spoken with a 9-1-1 emergency operator regarding a domestic disturbance with Davis, her former boyfriend. At Davis's ensuing trial for felony violation of a domestic no-contact order, the court admitted a recording of McCottry's exchange with the 9-1-1

12

operator over Davis's Confrontation Clause objection. *Id.* at 819. During the call, "McCottry was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.'" *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality op.)). Further, "the nature of what was asked and answered . . . , again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what happened in the past." *Id.* The Court also observed that there was a striking difference in the level of formality between the *Crawford* interview and the *Davis* interview. Whereas "Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers," "McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe." *Id.* Given those considerations, the Court concluded that "the circumstances of McCottry's interrogation objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. As a result, McCottry's statements to the 9-1-1 operator were not testimonial because "[n]o 'witness' goes into court to proclaim an emergency and seek help."[11] *Id.*

A different result ensued in the companion case—*Hammon v. Indiana*[12]—resolved by the United States Supreme Court in conjunction with *Davis*. In that case, police responded to a "reported domestic disturbance" at the Hammon home. *Hammon*, 547 U.S. at 819. Police found Amy Hammon alone on the front porch when they arrived, and although she appeared

---

[11]The *Davis* Court recognized that "a conversation which begins as an interrogation to determine the need for emergency assistance" can "'evolve into testimonial statements' once that purpose has been achieved." *Davis*, 547 U.S. at 828.

[12]*Hammon v. Indiana*, 547 U.S. 813 (2006).

13

frightened, she told officers that "nothing was the matter." *Id.* When the officers entered the home, they found broken glass on the ground in front of a gas heating unit. Hershel Hammon was in the kitchen when the officers arrived. He told them that he and Amy had been in an argument but "everything was fine now." *Id.* The officers separated the couple and one spoke with Amy separately while the other officer remained with Hammon. *Id.* Meanwhile, Amy gave the first officer an account of what happened and filled out an affidavit in which she stated, "[Hammon b]roke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter." *Id.* at 820.

When Amy did not appear to testify at trial, the trial court admitted—over Hammon's Confrontation Clause objection—her affidavit and the statements she made to the interviewing officer. The interviewing officer testified,

> [Amy] informed me that she and Hershel had been in an argument. That he became irrate [sic] over the fact of their daughter going to a boyfriend's house. The argument became . . . physical after being verbal and she informed me that Mr. Hammon, during the verbal part of the argument was breaking things in the living room and I believe she stated he broke the phone, broke the lamp, broke the front of the heater. When it became physical he threw her down into the glass of the heater.
>
> . . . .
>
> She informed me Mr. Hammon had pushed her onto the ground, had shoved her head into the broken glass of the heater and that he had punched her in the chest twice I believe.

*Id.* at 820–21.

14

The issue before the Court was whether Amy's oral statements to the police officer were testimonial. In evaluating that question, the Court observed that there was no emergency in progress at the time of the statements, there was no immediate threat to Amy when officers arrived at the scene, the officers did not hear any arguments between Hershel and Amy, and Amy told officers that "things were fine" when they arrived. *Id.* at 829–30. And, when the officer elicited the challenged statements, "he was not seeking to determine (as in *Davis*) 'what [was] happening,' but rather 'what happened.'" *Id.* at 830. When "[o]jectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.*

In comparing those circumstances to *Crawford*, the Court observed that "Amy's interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].'" *Id.* (alteration in original). And "[b]oth statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id.* Likewise, both "took place some time after the events described were over." *Id.* While the Court found the comparison to *Crawford* compelling, it found the comparison to *Davis* unpersuasive because McCottry's statements were made while she "was seeking aid, not telling a story about the past." *Id.* at 831. As a result, the Court concluded that Hammon's statements were testimonial.[13] *Id.* at 834.

The Court distilled its holding as follows:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the

---

[13]The Court later explained, in *Williams v. Illinois*, 567 U.S. 50 (2012), that, "in *Hammon* and every other post-*Crawford* case in which the Court has found a violation of the confrontation right, the statement at issue had the primary purpose of accusing a targeted individual." *Id.* at 83.

15

> interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. This holding has been referred to as the "'primary purpose' test for determining the testimonial nature of statements." *United States v. Duron-Caldera*, 737 F.3d 988, 992 (5th Cir. 2013) (citing *Davis*, 547 U.S. at 822);[14] *see De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

Using *Davis* and *Hammon* as our touchstones, we must determine if the circumstances in this case (1) objectively indicate that the primary purpose of Delgado's conversation with Hutzelman was to "enable police assistance to meet an ongoing emergency" or (2) whether the circumstances objectively indicate that there was no ongoing emergency when Delgado spoke with Hutzelman and the purpose of the conversation was to "prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Bryant*, 562 U.S. at 359. The "subjective or actual purpose of the individuals involved in a particular encounter" is not relevant. *Id.* at 360. Instead, "the purpose that reasonable participants would have had," as ascertained by their statements, actions, "and the circumstances in which the encounter occurred," is the relevant inquiry. *Id.*

---

[14]The Court clarified, in *Michigan v. Bryant*, 562 U.S. 344 (2011), "that the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the 'primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency." *Id.* at 374 (quoting *Davis*, 547 U.S. at 822).

16

When Delgado arrived at the scene, Brown was inside of the home sweeping glass from the living room floor and Hutzelman was seated on the couch. Brown indicated that he and Hutzelman had been "getting into it," but there was no ongoing disturbance at the time of the officers' arrival. Delgado testified that he took Hutzelman into the hallway, "away from [Brown,]" so that "he [could not] hear anything." Once in the hallway, removed from any immediate threat from Brown, Hutzelman told Delgado that she and Brown were "getting into it" and that he began to assault her as they were arguing.[15] Hutzelman told Delgado that Brown had thrown an object at her in the kitchen, punched her in the stomach, hit her with a broom in the shoulder and upper torso area, and then began to choke her. Hutzelman stated that she broke free and went outside, where she and Brown continued to argue until Brown pulled her back inside the house. Hutzelman did not require medical attention for her injuries.

In this case, as in *Hammon*, the declarant was separated from the defendant and was removed to the hallway where she spoke with Delgado and recounted to him the events of the dispute and physical encounter with Brown. The act of separating Hutzelman from Brown in order to speak with her—as in *Hammon*—"was sufficient to end" any emergency that might have existed. *See Bryant*, 562 U.S. at 364 (citing *Davis*, 547 U.S. at 830–32). And, as in *Hammon*, Hutzelman's statements to Delgado recounted how potentially criminal past events began and

---

[15]In *Bryant*, the United States Supreme Court recognized that, since "Hammon was armed only with his fists when he attacked his wife," "removing [her] to a separate room was sufficient to end the emergency." *Bryant*, 562 U.S. at 364 (citing *Davis*, 547 U.S. at 830–32). In this case, the State argues that Brown was still a threat—even after Hutzelman had been removed to the hallway—since there was broken glass on the floor that could be used as a weapon. Yet, the record does not reflect that Brown ever used the broken glass as a weapon or that he threatened to use it as a weapon. And, in *Hammon*, there was also broken glass on the floor. The Supreme Court did not view that circumstance as one that extended any sort of emergency. It observed, though, that, "[i]f Hershel had been reported to be armed with a gun, . . . separation by a single household wall might not have been sufficient to end the emergency." *Id.* (citing *Davis*, 547 U.S. at 819).

17

progressed. *See Hammon*, 547 U.S. at 830. The interview took place after the events described were over and, because there was no ongoing emergency, were not apparently made for the purpose of seeking aid in an emergent situation. *Id.* Instead, Hutzelman's statements recited a history of the encounter between Hutzelman and Brown. Those circumstances, together with the information Hutzelman provided to Delgado, do not objectively indicate that the primary purpose of her statements was to "enable police assistance to meet [an] ongoing emergency."

The formality of the manner in which the statement was made is also an important factor in determining whether the primary purpose of the communication was testimonial—whether the declarant would reasonably believe that the statement would be used in a subsequent prosecution. *See Bullcoming v. New Mexico*, 564 U.S. 647, 665 (2011) ("the formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the declarant's] assertions as testimonial"); *Bryant*, 562 U.S. at 366 (holding that court did not sufficiently account for importance of informality in encounter between victim and police in assessing whether statement was testimonial but acknowledging that "informality does not necessarily indicate . . . the lack of testimonial intent"); *Hammon*, 547 U.S. at 830 (holding that act of separating declarant from defendant in order to conduct investigation was "formal enough" under circumstances to render statement testimonial).

The State contends that, because Delgado did not tell Hutzelman that she was being recorded or advise her of her *Miranda*[16] rights prior to questioning, the formality of the manner

---

[16]*Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966) ("if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent").

in which the statements were made indicates that the statements were nontestimonial.[17]  The Supreme Court recognized that the *Crawford* interrogation "followed a *Miranda* warning, was tape-recorded, and took place at the station house."  *Hammon*, 547 U.S. at 830 (citing *Crawford*, 541 U.S. at 53 n.4).  Even so, "[w]hile these features certainly strengthened the statements' testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point."  *Id.*

Here, as in *Hammon*, Hutzelman was removed to a different area of the residence—away from her assailant—for the interrogation.  In *Hammon*, the Supreme Court found that "[i]t was formal enough that Amy's interrogation was conducted in a separate room, away from her husband . . . with the officer receiving her replies for use in his 'investigation.'"  *Id.*  The circumstances of Hutzelman's interrogation were much the same and were, therefore, "formal enough."  *Id.*

The statements and actions of the parties and the circumstances in which the encounter occurred, when viewed from an objective standpoint, lead us to conclude that "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . precisely what the officer should have done."  *Davis*, 547 U.S. at 830.  As a result, we conclude that Hutzelman's statements to Delgado were testimonial and that their admission into evidence was error.

---

[17]Although Delgado testified that he was not wearing a body camera at the time he questioned Hutzelman, her statements in response to his questions were recorded to the dash camera of his squad car.  Delgado also "recorded the statements that [Hutzelman] made to [him] in [his] report as [he] recall[ed] them."

### C. Hutzelman's Statements to Wolf Were Testimonial

After Delgado finished speaking with Hutzelman, Wolf retreated to the hallway to speak with her as well. That conversation—unlike Hutzelman's conversation with Delgado—was recorded on Wolf's body camera, the nearly fifteen-minute recording of which was shown to the jury over Brown's Confrontation Clause objection. Wolf's testimony regarding his interview of Hutzelman was also admitted into evidence over Brown's Confrontation Clause objection.

In speaking with Wolf, Hutzelman was plainly responding to questioning.[18] None of the circumstances in the home had changed from the time that Delgado questioned Hutzelman. Wolf elicited the same information as did Delgado, albeit in a bit more detail. He also asked about other witnesses and asked the same or similar question multiple times.[19] For the reasons stated above, we likewise conclude that Hutzelman's statements to Wolf were testimonial and that their admission into evidence was error.

### IV. Harm Analysis

"Constitutional error is harmful unless a reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction." *Haggard v. State*, 612 S.W.3d 318, 328 (Tex. Crim. App. 2020) (citing TEX. R. APP. P. 44.2(a)). "The State has the burden, as beneficiary of the error, to prove that the error is harmless beyond a reasonable doubt." *Id.* (citing *Deck v. Missouri*, 544 U.S. 622, 635 (2005)). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a

---

[18]During the interview, Wolf asked Hutzelman over fifty questions.

[19]After Brown was arrested, Wolf spoke with Hutzelman again and took photographs of Hutzelman's injuries.

reasonable doubt." *Wall*, 184 S.W.3d at 746 (citing *Chapman v. California*, 386 U.S. 18, 23–24 (1967)). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled in part on other grounds by Estele v. McGuire*, 502 U.S. 62, 72 n.4 (1991). This issue, therefore, is whether, in "*this* trial," "the guilty verdict actually rendered . . . was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

"In determining specifically whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt," we consider the following factors:

> 1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall strength of the prosecution's case.

*Scott v. State*, 227 S.W.3d 679, 690 (Tex. Crim. App. 2007) (citing *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006)). Keeping this guidance in mind, we turn to the issue of whether the erroneous admission of Hutzelman's out-of-court testimonial statements to Delgado and Wolf were harmless beyond a reasonable doubt.

### A. Importance of the Statements to the State's Case

The State called the following witnesses to testify at trial: Delgado, Wolf, Marco Gomez, and Hall Reavis. Brown did not call any witnesses. Delgado's and Wolf's testimony is set forth in the previous sections of this opinion. In reviewing their testimony to determine whether it includes information pertaining to the offenses for which Brown was tried—other than statements made to them by Hutzelman—we find very little.

21

Delgado testified that, when he approached the front door of the residence, he heard what sounded like glass being swept up. The door was closed, and he and Wolf knocked and identified themselves to the male subject who opened the door. Delgado identified the male subject as the defendant. Brown was sweeping up glass from the living room floor with a broom. Brown told Delgado that he and his girlfriend were just "getting into it." Hutzelman was in the living room seated on the couch. She seemed scared, and Brown was doing all the talking. Delgado took Hutzelman into the hallway to speak with her while Wolf stayed with Brown. Delgado observed that Hutzelman had a broken blood vessel in her right eye. She also had some red markings on her throat area, "like if someone grabbed [her] around there. Those [were] the injuries [he] observed." Delgado identified the defendant as Brown and testified that the call to which he responded was on June 25, 2018. According to Delgado, Hutzelman was afraid of what was going on, and she was afraid to release any information in Brown's presence.

Wolf testified that he responded to the call at 1704 Hutchings in Longview on June 25, 2018. Before the front door opened, it sounded like somebody was sweeping up glass. Brown opened the door and let the officers inside. Wolf identified the defendant as the man who opened the door. Hutzelman was seated on the couch and seemed calm and not erratic. Brown was sweeping glass and sweating profusely. He was doing the talking. He stated that Hutzelman had a seizure and items were broken in the process. He stated that Hutzelman was running down the street and that he was trying to prevent her from acting crazy.

Brown and Hutzelman had been together for twelve years and had lived in the Hutchings home for three or four years. Brown referred to Hutzelman as his wife and stated that she was

22

having trouble with her medications. Brown stated that he took care of Hutzelman and did everything he could to keep her calm. When Wolf spoke with Hutzelman in the hallway, she seemed upset and emotional. There was some bruising around Hutzelman's right eye. It looked bloodshot.

Wolf took photographs of Hutzelman that depicted some bruising on the upper part of her left arm and a bloodshot right eye. Wolf also noticed that the left side of Hutzelman's neck was red. Hutzelman and Brown were the only persons in the home. Hutzelman declined to provide a recorded statement. Hutzelman had no abrasions, and she was not bleeding. As far as Wolf knew, she did not go to the hospital that night.

Next, we review the testimony offered by Gomez and Reavis as relevant to the offenses for which Brown was tried. Gomez testified that he called 9-1-1 on June 25, 2018. At that time, Gomez was living at 1707 Hutchings in Longview. Gomez called 9-1-1 because he heard sounds like people fighting outside. He looked outside the window and saw two people fighting outside. He could not tell who they were. He saw the people who were fighting go back inside the house. Gomez clarified that by "fighting," he meant arguing. When asked if he knew who lived in "that house," Gomez stated that he did not know their names but identified Brown in the courtroom as the man who live[d] at 1704 Hutchings. He had also seen a blond woman coming and going from the house.

On the 9-1-1 call, Gomez stated that he heard someone get slapped but that he did not see it. He did not know who was slapped or who did the slapping. He did not see any physical contact.

23

Reavis, chief investigator for the Gregg County District Attorney's Office, testified about his efforts to serve Hutzelman with a trial subpoena. His testimony was elicited on the issue of forfeiture by wrongdoing, and he did not testify to any of the events giving rise to Brown's arrest.

It is apparent, when viewed in the light of the entirety of the State's evidence, that Hutzelman's statements to Delgado and Brown were crucial to the State's case. To prove Brown committed the third-degree-felony offense of family violence assault[20] against Hutzelman, the State was required to show that Brown "[i]ntentionally, knowingly, or recklessly cause[d] bodily injury to [Hutzelman]," who was (1) in a "dating relationship" with him,[21] (2) was Brown's "family member,"[22] or (3) was living together in the same dwelling with Brown, regardless of whether the two were related,[23] and that Brown had previously been convicted of an offense under Chapter 19 or 22 of the Texas Penal Code or "Section 20.03, 20.04, 21.11, or 25.11 against a person whose relationship to or association with [him] is described by Section 71.0021(b), 71.003, or 71.005, Family Code." TEX. PENAL CODE ANN. § 22.01(b)(2)(A). To prove Brown committed the second-degree-felony offense of family violence assault by impeding Hutzelman's breathing,[24] the State was required to show the statutorily required relationship between Brown and Hutzelman under the Family Code, as described, that Brown had previously

---

[20]*See* TEX. PENAL CODE ANN. § 22.01(b)(2)(A).

[21]TEX. FAM. CODE ANN. § 71.021(b).

[22]TEX. FAM. CODE ANN. § 71.003.

[23]*See* TEX. FAM. CODE ANN. § 71.005.

[24]*See* TEX. PENAL CODE ANN. § 22.01(b-3).

24

been convicted of an offense against a person in the proper relationship to him as described above and that the offense was committed by "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of [Hutzelman] by applying pressure to [Hutzelman's] throat or neck . . . ." TEX. PENAL CODE ANN. § 22.01(b-3).

Assuming the evidence established the statutorily required relationship and the statutorily required past conduct by Brown, there is no direct evidence—absent Hutzelman's testimonial statements—that Brown caused bodily injury to Hutzelman and that he did so with the statutorily required mental state. Absent the testimonial statements, the evidence showed that Hutzelman had a red or bruised right eye, a red mark on her upper arm, and a red mark on the left side of her neck. Even if this evidence could be viewed as circumstantial evidence that Brown inflicted bodily injury on Hutzelman, it is weak. Gomez could not identify the individuals who were arguing in the yard and did not see any physical contact between the individuals. Delgado and Wolf observed Hutzelman's injuries when they were called to the scene, but other than stating that he and Hutzelman were "getting into it," Brown never admitted to inflicting any injury on Hutzelman and offered alternative explanations for what had occurred.

**B.     Whether the Out-of-Court Statements Were Cumulative of Other Evidence**

Hutzelman's out-of-court statements were cumulative, to some extent, of other evidence regarding her injuries. Photographs depicting Hutzelman's injuries were shown to the jury. Both Delgado and Wolf testified as to their observations of Hutzelman's injuries. But Hutzelman's out-of-court statements about how she received those injuries are not cumulative of any other evidence in the record, other than what might be described as circumstantial evidence

25

of Brown's presence in the home, the absence of other persons on the premises, and the fact that Brown was sweeping up glass.

### C. The Presence or Absence of Evidence Corroborating or Contradicting the Out-of-Court Statement on Material Points

As described above, the photographs of Hutzelman's injuries and the officers' testimony regarding their observations of those injuries corroborates Hutzelman's out-of-court statements that she was injured. The officers' testimony and that of Brown corroborate the out-of-court statements (albeit implicitly) that Brown was present at the residence at the time of the alleged assault. The only corroborating evidence of the material out-of-court statements that Brown assaulted Hutzelman consists, as described above, of Brown's presence on the premises, the absence of others on the premises, and the fact that Brown was sweeping up broken glass.

Wolf testified that, according to Brown, Hutzelman had a seizure and items were broken in the process, that Hutzelman was running down the street and he was trying to prevent her from acting crazy, and that Hutzelman was having trouble with her medication and he was trying to keep her calm. When viewed liberally, this evidence could be interpreted as contradicting Hutzelman's out-of-court statements that Brown assaulted her. Brown's statement to Wolf that Hutzelman was running down the street corroborates, to a limited extent, Hutzelman's out-of-court statements that the couple fought outside for a time before she was dragged back into the house.

### D. The Overall Strength of the State's Case

As we have previously stated, there was some circumstantial evidence that Brown assaulted Hutzelman, and there was, likewise, evidence that Hutzelman was injured. But absent

26

the inadmissible out-of-court testimonial statements, the State's case was weak as there was no other direct testimony that Brown caused bodily injury to Hutzelman and that he did so with the statutorily required mental state; and Brown offered alternative explanations for what had occurred.

### E. The State's Closing Argument

In addition to the four explicit factors the Texas Court of Criminal Appeals set out in *Scott* to determine whether error under *Crawford* is harmless beyond a reasonable doubt, *Scott*, 227 S.W.3d at 690, the Court has also considered the State's emphasis on testimonial statements during final argument, *id.* at 694–95. In this case, the State emphasized the substance of the testimonial statements in its closing argument.

The State first urged the jury to consider Hutzelman credible, as apparent from the recordings and her conversations with the officers: "But when [the officer] starts asking her what happened, she was so truthful. Listen, if somebody is embellishing something, why would you say, 'Okay. Yeah, the redness and the bruising that's from him earlier today, but the bump's not. That wasn't him.'" The State continued, "That's credibility . . . [i]f she's wanting to embellish and do something bad to him, throw everything but the kitchen sink. She tells you what he did and didn't do on her."

After urging the jury to consider Hutzelman credible based on her statements to the officers, the State emphasized Hutzelman's statements regarding the elements of the offenses: "[T]he evidence of his choking is her saying, 'he choked me.' That's the evidence. It's just corroborated by the marks around her neck." The State also pointedly reminded the jury that

27

Hutzelman told the officers, "He held me and he choked me, I couldn't breathe for about four to five seconds." The State also emphasized that "he came at her with [a broom] and started hitting her with a broom."

We are not simply to evaluate whether the verdict enjoys some evidentiary support. *See Scott*, 227 S.W.3d at 690; *Wilson*, 296 S.W.3d at 149. When we consider "the likelihood" that the erroneous admission of Hutzelman's testimonial statements was "actually a contributing factor in the jury's deliberations in arriving at a verdict," *Scott*, 227 S.W.3d at 690, we cannot conclude, beyond a reasonable doubt, "that the error did not contribute to [Brown's] conviction." *Id.* at 690–91 (quoting TEX. R. APP. P. 44.2(a)).

## V. Conclusion

For the reasons stated above, we reverse the trial court's judgment and remand to the trial court for a new trial.

Scott E. Stevens
Justice

Date Submitted:     June 14, 2021
Date Decided:       September 2, 2021

Do Not Publish

28